# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 3, 2014

## STATE OF TENNESSEE v. JOE TRAVIS NORTHERN, JR.

**Appeal from the Criminal Court for Madison County**
**No. 13-405      Roy B. Morgan, Jr., Judge**

---

**No. W2013-02757-CCA-R3-CD  - Filed December 3, 2014**

---

The defendant, Joe Travis Northern, Jr., was convicted by a Madison County Criminal Court jury of possession of more than one-half ounce of marijuana with the intent to sell or deliver, a Class E felony; possession of a firearm during the commission of a dangerous felony with a prior felony, a Class D felony; possession of a firearm by a convicted felon, a Class E felony; tampering with evidence, a Class D felony; and possession of drug paraphernalia, a Class A misdemeanor, and was sentenced by the trial court as a Range II, multiple offender to an effective term of eighteen years in the Department of Correction.  On appeal, the defendant challenges the sufficiency of the evidence in support of his convictions and argues that the trial court imposed an excessive sentence.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

George Morton Googe, District Public Defender; and Jeremy B. Epperson, Assistant Public Defender, for the appellant, Joe Travis Northern, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; James G. Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On January 9, 2013, Jackson police officers executed a search warrant at the

defendant's residence, where the defendant and a second man, Desmond Jones, were present. Inside the home, the officers found loose marijuana floating in a just-flushed toilet, plastic baggies containing marijuana, a box of plastic sandwich bags, two sets of digital scales with marijuana residue, a marijuana grinder, a marijuana blunt, a police scanner, and a 9- millimeter handgun. The defendant admitted to the officers that the marijuana, digital scales, and police scanner belonged to him but claimed that he used them for his own personal consumption and not for resale. He denied that the weapon was his. The defendant was subsequently charged in a nine-count indictment with two counts of possession of more than one-half ounce of marijuana with the intent to sell/deliver, four counts relating to the possession of a firearm during the commission/attempt to commit a dangerous felony; possession of a firearm by a convicted felon; tampering with evidence; and possession of drug paraphernalia.

At trial, Captain Christopher Wiser of the Jackson Police Department's Gang Enforcement Unit testified that he found in the home a loaded 9-millimeter Ruger P95 handgun in the kitchen in the space between the wall and a kitchen countertop and a set of digital scales, an open box of sandwich bags, a marijuana grinder, a marijuana blunt, and a bag of loose marijuana on the coffee table in the living room. On cross-examination, he agreed that it would not be uncommon for someone who consumed marijuana to have a marijuana grinder or a marijuana blunt in his or her home.

Investigator Rodney Anderson of the Jackson Police Department's Gang Enforcement Unit testified that he found a police scanner in the living room of the home. He said that police scanners can be used by drug dealers both to listen to "police traffic" and to possibly pick up transmissions between the police and a confidential informant who is wearing a "body wire." On cross-examination, he testified that the police scanner was turned off when they arrived to execute their search but that they turned it on and the device was working.

Lieutenant Phillip Kemper of the Jackson Police Department's Gang Enforcement Unit testified that he found a set of black digital scales with marijuana residue under the couch in the living room of the home. He said that digital scales are commonly used by both sellers and buyers of narcotics to ensure that the amount being sold is accurate.

Investigator Sam Gilley of the Jackson Police Department's Gang Enforcement Unit, the case officer in charge of the search, testified he entered the residence to hear a toilet running in a bathroom near the area in which the SWAT Team had just detained the defendant. He said he looked inside, saw marijuana floating on top of the water, and fished it out of the bowl with the net he carried for such purposes. He also saw either a half-gallon or a gallon-sized ziplock bag, with some remnants of marijuana still inside, lying on the floor of the bathroom. Investigator Gilley explained that lower level street dealers typically

purchase their supplies of marijuana in either a half-gallon bag, which will hold approximately one-half pound, or in a gallon bag, which will hold approximately one pound. He further testified that he and his officers pulled the toilet off the floor and were able to "plainly see that the marijuana was flushed down the toilet also." They were not, however, able to retrieve the flushed marijuana from the sewer line.

Investigator Gilley testified that he found approximately seven "twisted off baggies" on the coffee table in the living room. He explained that these were common in the drug trade:

> [I]f you're selling somebody some marijuana and say they want to buy like a quarter ounce, you'd measure out three and a half, four or five grams of marijuana. You normally throw it on the scale in front of them, throw it on a baggie, tie the baggie up and put it in a little–you know, twist it around in the corner and tie a knot, or whatever you do.

Investigator Gilley testified that the portions of the baggies that he found on the coffee table were consistent with someone selling, rather than buying, marijuana. He explained that if one were a user or a buyer, he would have the cut off corner of the baggie that contained the drugs rather than the remaining portion from which the corner had been cut off: "If you were just a user, you would have the corner where the drugs are. There would be no reason for that [the twisted off portion ] to be laying around your house unless you were selling drugs."

Investigator Gilley testified that the 9-millimeter Ruger handgun recovered from the kitchen of the home was loaded with a clip containing ten bullets. He said that a handgun is commonly used in the drug trade "for defense." He agreed that the other items found in the house, including the police scanner, digital scales, marijuana grinder, and plastic bags were "consistent with the sale or delivery of marijuana" and that items consistent with the smoking or consumption of marijuana, such as rolling papers or pipes, were not found in the home. Finally, he identified the statement that the defendant gave in which he denied that he sold drugs, disavowed any knowledge of the gun found in his home, and claimed that the drugs and drug paraphernalia were items he used in his personal consumption of marijuana. The defendant's statement reads in pertinent part:

> Des [Desmond Jones] come to my house about a hour ago. He did not bring any drugs or weapons inside of my house. Des did not bring anything illegal inside of my house. The marijuana inside of that house is mine. I did not have any other drugs inside the house other than marijuana. The marijuana on the living room coffee table and the marijuana inside the toilet is all that I had. I did not have any guns inside of my house or on my property. I do not sell

marijuana, I only smoke marijuana. I only keep marijuana to smoke, depending on how much money I have. The scales and police scanner are mine. The other guy here does not have anything to do with what's in my house.

On cross-examination, Investigator Gilley acknowledged that, despite his direct examination testimony that there were no items consistent with the consumption of marijuana in the home, the home contained a blunt, "roaches" in an ash tray, and some "cigarillo" packaging in the trash.

Tennessee Bureau of Investigator Special Agent Shelandis Garrett, a forensic scientist in the drug chemistry unit of the Memphis Laboratory, testified that the three samples submitted for her analysis in the case consisted of a marijuana cigar, 2.07 grams of marijuana, and 29.57 grams of marijuana. On cross-examination, she agreed that the total weight of the marijuana in the two separate samples was 31.5 grams, which was just over one ounce.

Desmond Jones testified that he arrived at the defendant's house moments before the police officers arrived to execute the search warrant and that he did not bring any drugs or weapons into the home. He stated that the defendant was in a back room when the officers arrived. On cross-examination, he testified that he did not see the defendant with any drugs or weapons.

Eric Muhammad testified in the defendant's behalf that, unbeknownst to the defendant, he hid his 9-millimeter P60 Ruger pistol in the defendant's kitchen when he left for a quick trip to the store while visiting the defendant on the morning of the search. He said that when he returned from the store and saw the drug task force at the defendant's home, he continued to his own home without stopping. On cross-examination, he testified that he was somewhat familiar with handguns but would not be surprised to learn that the pistol was a P95 rather than a P60 Ruger. He acknowledged that he and the defendant were close friends and testified that he showed the pistol to the defendant when he arrived at his home because he thought the defendant might purchase it. He was unable to explain why he had felt it necessary to hide the pistol in the kitchen when he left for the store.

The defendant elected not to testify and rested his case without presenting any further proof. Following deliberations, the jury first convicted him of possession of more than one-half ounce of marijuana with the intent to sell and with the intent to deliver, possession of a firearm during the commission of or attempt to commit possession of marijuana with the intent to sell and with the intent to deliver, tampering with evidence, and possession of drug paraphernalia. After the State had presented evidence of the defendant's criminal record in

the second phase of the trial, the jury deliberated and convicted the defendant of the three additional counts of the indictment relating to his having a prior conviction for aggravated assault, including possession of a firearm by a convicted felon having been previously convicted of the felony of aggravated assault. At the sentencing hearing, the trial court merged the sale and delivery convictions in counts one and two and the firearm possession convictions in counts three through six. The court found three applicable enhancement factors: (1) the defendant's previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range; (8) the defendant's history of failure to comply with the conditions of a sentence involving release into the community; and the defendant's history of having been adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult. See Tenn. Code Ann. § 40-35-114(1), (8), (16) (2012). The trial court found no applicable mitigating factors. Accordingly, the court sentenced the defendant as a Range II, multiple offender to three years for the possession of marijuana with the intent to sell or deliver conviction, seven years for the possession of a firearm during the commission of a dangerous felony conviction, seven years for the possession of a firearm by a convicted felon conviction, eight years for the tampering with evidence conviction, and eleven months, twenty-nine days for the misdemeanor possession of drug paraphernalia conviction. The trial court ordered the seven-year sentences to be served consecutively to the eight-year tampering with evidence sentence and to the three-year possession with the intent to sell or deliver sentence, for an effective term of eighteen years in the Department of Correction.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first challenges the sufficiency of the evidence in support of his convictions, arguing that the facts, while undisputed, do not support a finding that he was anything other than a consumer of marijuana. When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves

all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In support of his argument that the evidence is insufficient to show that he was anything other than a consumer of marijuana, the defendant points to the officers' acknowledgment that digital scales, plastic baggies, and a marijuana grinder are items commonly used by both drug sellers and users. He also asserts that the police scanner was "not functioning" when the officers arrived to execute the warrant and points out that his friend acknowledged that the weapon was his. Finally, he argues that there was no evidence that he "knew that officers were conducting an investigation for him to be found guilty of [t]ampering with [e]vidence." We respectfully disagree.

When viewed in the light most favorable to the State, the evidence showed that the defendant, who was no doubt surprised by the arrival of the officers, managed to flush a bag of marijuana down the toilet just before the SWAT team made entry into his house. Inside the home were items that were not only consistent with either the sale or consumption of marijuana but also items that would commonly be found in the residence of someone who was selling, rather than merely using, the drug. These included the remnants of the plastic bags from which the corners that would contain a small amount of marijuana for resale had been twisted or cut off, as well as the police scanner, which, according to Investigator Anderson, was functioning, albeit not turned on, at the time the officers arrived to execute the search. As for the loaded handgun the officers found hidden in the defendant's kitchen, it was within the province of the jury to disbelieve the defendant's close friend, who claimed ownership of the weapon, and to instead conclude that it belonged to the defendant. In sum, we conclude that the evidence was sufficient for a rational jury to find the defendant guilty of the offenses beyond a reasonable doubt.

## II. Sentencing

The defendant also contends that the trial court imposed an excessive sentence by "fail[ing] to properly apply mitigating factors." Specifically, he argues that mitigating factors (1) and (13) should have been applied and resulted in the minimum sentences for the offenses. We, again, respectfully disagree.

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
>
> (2) The presentence report;
>
> (3) The principles of sentencing and arguments as to sentencing alternatives;
>
> (4) The nature and characteristics of the criminal conduct involved;
>
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
>
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
>
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

The record reflects that the trial court imposed the sentences after proper consideration

of the purposes and principles of our sentencing act and consideration of both the State's proposed enhancement factors, as well as the defendant's proposed mitigating factors and the "catchall" mitigating factor, finding that no mitigating factors were applicable in the case. We conclude, therefore, that the trial court did not abuse its discretion in sentencing the defendant.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE